IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ELSA ANCHONDO,
on behalf of herself and all others
similarly situated,

                    Plaintiff,                  No. 08-CV-202 RB/WPL

     v.

ANDERSON, CRENSHAW
& ASSOCIATES LLC,

                    Defendant.

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO COMPEL

### I.    Underlying Facts and Procedural Posture

#### A.    ACA Left a Voicemail Message for Ms. Anchondo in Which It Failed to Identify Itself and in Which It Invited a Call Back

The relevant facts here are simple, straightforward and undisputed.  Plaintiff Elsa

Anchondo is an alleged debtor.  *See*, Docket No. 11, Joint Status Report, Stipulated Facts Nos. 2

and 5-7.  Defendant Anderson, Crenshaw & Associates LLC ("ACA") is a debt collector.  *See*,

*id.*, Stipulated Facts Nos. 3 and 4.  The obligation which ACA sought to collect is a debt.  *See*,

*id.*, Stipulated Fact No. 7.

In December, 2007, ACA left at least two prerecorded voicemail messages for Ms.

Anchondo.  In the messages, ACA stated in full:

> Hello.  This message is for Elsa Anchondo.  This is not a sales call.  You  have an
> important matter with our company that deserves your immediate attention.  Please call
> me back as soon as possible at the following number: 866-400-3550.  When returning this
> call please refer to reference number 423635.  If you wish to speak to someone now
> regarding your account, press zero.  Thank you.

*See*, Docket No. 1, complaint, ¶ 11; Docket No. 3, answer, ¶ 11 (admitting text of voicemail

message as set forth in ¶ 11 of the complaint); Docket No. 11, Joint Status Report, Stipulated

Fact No. 9.  The telephone number recited in this message is a telephone number for ACA.  *See*,

Docket No. 1, complaint, ¶ 12; Docket No. 3, answer, ¶ 12 (admitting ¶ 12 of the complaint);

Docket No. 11, Joint Status Report, Stipulated Fact No. 10.  In the prerecorded voicemail

messages, ACA did not identify itself or state that the communication is an attempt to collect a

debt, as required by the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.*

("FDCPA").  *See*, 15 U.S.C. §§ 1692d(6) and 1692e(11).[1]

Numerous courts have held that nearly identical voicemail messages left by debt

collectors violate the FDCPA.  *See*, *Hosseinzadeh v. M.R.S. Associates, Inc.*, 387 F.Supp.2d 1104

(C.D. Cal. 2005); *Foti v NCO Financial Systems, Inc.*, 424 F.Supp.2d 643 (S.D. N.Y. 2006);

*Leyse v. Corporate Collection Services, Inc.*, No. 03-CV-8491, 2006 U.S. Dist. LEXIS 67719

(S.D. N.Y. Sept. 18, 2006); *Belin v. Litton Loan Servicing*, No. 8:06-CV-760, 2006 U.S. Dist.

LEXIS 47953 (M.D. Fla. July 14, 2006); *Costa v. National Action Financial Services*, No. S-05-

2084, 2007 U.S. Dist. LEXIS 93230 (E.D. Cal. Dec. 19, 2007); *Masciarelli v. Richard J.*

*Boudreau and Associates, LLC*, 529 F.Supp.2d 183 (D. Mass. 2007); *Edwards v. Niagara Credit*

*Solutions, Inc.*, No. 1:07-CV-2396, 2008 U.S. Dist. LEXIS 95040 (N.D. Ga. Nov. 13, 2008).  *See*

*also*, *Joseph v. J. J. MacIntyre Companies LLC*, 281 F.Supp.2d 1156, 1163 (N.D. Cal. 2003)

---

[1] In 15 U.S.C. § 1692d(6), Congress prohibits "the placement of telephone calls without meaningful
disclosure of the caller's identity."  In 15 U.S.C. § 1692(e)(11), Congress declares the following conduct unlawful:
The failure to disclose in the initial written communication with the consumer and, in addition, if
the initial communication with the consumer is oral, in that initial oral communication, that the
debt collector is attempting to collect a debt and that any information obtained will be used for that
purpose, and *the failure to disclose in subsequent communications that the communication is*
*from a debt collector*, except that this paragraph shall not apply to a formal pleading made in
connection with a legal action.
15 U.S.C. § 1692(e)(11) (emphasis added).

(FDCPA's prohibition on "the making of telephone calls without meaningful disclosure of the caller's identity" applies "equally to automated message calls and live calls"); *Ramirez v. Apex Financial Management, LLC*,567 F.Supp.2d 1035, 1040-42 (N.D. Ill. 2008) (prerecorded voicemail messages left for debtors are "communications" under the FDCA); *Thomas v. Consumer Adjustment Company, Inc.*, 579 F.Supp.2d 1290, 1296-97 (E.D. Mo. 2008) (voicemail message where debt collector left its telephone number and asked for debtor to call back is "communication" under the FDCPA).

**B.     The Court Has Indicated that If the Reference Number or Phrase "Your Account" Recited in ACA's Voicemail Messages Concerned a Debt, then the Voicemail Messages Constitute "Communications" Under the FDCPA**

The Court has denied ACA's motion to dismiss.  Docket No. 35, order, *reported at*, 583 F.Supp.2d 1278.  The first argument that ACA raised in its motion to dismiss was that the voicemail messages it left for Ms. Anchondo were not "communications" under the FDCPA. Docket No. 21, brief, pp. 5-11.  In denying the motion to dismiss, the Court held that "[i]f the reference number or the account in question" referred to in ACA's voicemail message "pertained to a debt, then the voicemail message was a 'communication' subject to the disclosure requirements of the FDCPA."  *Id.* at 5, *reported at*, 583 F.Supp.2d at 1281.

ACA has admitted that the reference number and the phrase "your account" recited in the voicemail message referred to an account in Ms. Anchondo's name originated by APX Alarm Security Solutions, Inc.  *See*, Exhibit A, discovery responses (responses to Requests for Admission Nos. 6 and 7).  ACA has admitted that this account is a "debt account."  *See*, *id.* (response to Request for Admission No. 8).  ACA has admitted that it did not identify itself in

the voicemail messages and that it did not state that it was a debt collector in the messages.  *See*, *id.* (responses to Requests for Admission Nos. 11 and 12).

### C.     ACA's Constitutional Challenges Are Not Yet Ripe

The second argument that ACA raised in its motion to dismiss was that the FDCPA, as applied in this lawsuit, violates its constitutional due process and commercial free speech rights. Docket No. 21, brief, pp. 11-23.  In response to ACA's constitutional arguments, the United States of America intervened in the lawsuit and argued in favor of the constitutionality of the FDCPA.  Docket No. 19, order (allowing United States to intervene); Docket No. 25, United States' brief.  The Court held that the constitutional issues will not be ripe until the Court has determined whether the voicemail message constitutes a "communication" under the FDCPA. *See*, Docket No. 35, order, p. 5, *reported at*, 583 F.Supp.2d at 1281.  At least one other court that has considered the very same commercial free speech challenge that ACA makes here has rejected the challenge.  *See*, *Berg v. Merchants Association Collection Division, Inc.*, No. 08-60660-CV, 2008 U.S. Dist. LEXIS 94023 at *17-21 (S.D. Fla. Oct. 31, 2008).

### D.     ACA's Bona Fide Error Defense Expands the Relevant Areas of Discovery in this Lawsuit

Given the Court's rulings and the state of the evidence, it very well might be that ACA's last refuge will be its bona fide error defense.  Docket No. 3, answer, ¶ 34 (alleging bona fide error defense).  The affirmative defense of bona fide error is similar to a good faith defense, albeit with more exacting requirements.  As a result, the good faith defenses is more difficult for a defendant debt collector to prove up.  The bona fide error defense is provided for in the FDCPA:

4

> A debt collector may not be held liable in any action brought under [the FDCPA] if the debt collector shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

15 U.S.C. § 1692k(c).  In the Tenth Circuit, for a debt collector defendant to prevail under the bona fide error defense, the debt collector must show "that the violation was (1) unintentional, (2) a bona fide error, and (3) made despite the maintenance of procedures reasonably adapted to avoid the violation."  *Johnson v. Riddle*, 305 F.3d 1107, 1121 (10th Cir. 2002) (*"Johnson I"*) (quotations omitted).  Mistakes of law can be considered a bona fide error.  *Id.*

Applying these tenets to this lawsuit, to establish bona fide error, ACA must show (1) that it intended to comply with the FDCPA concerning its voicemail message, (2) that a reasonable mistake of law caused it to wrongfully believe that its voicemail message complied with the FDCPA and (3) that it maintained reasonable procedures specifically designed to prevent this error.  Procedures for general FDCPA compliance training – the only FDCPA compliance work that ACA has revealed so far – are insufficient.  *Johnson v. Riddle*, 443 F.3d 723, 730 (10th Cir.) (*"Johnson II"*) ("sending employees and staff to training seminars or subjecting employees and staff to compliance testing cannot shield an attorney for liability for legal errors").  Thus, if ACA neglected to conduct adequate legal research concerning the legality of its voicemail message, or if it relied on shoddy legal research, it cannot invoke the bona fide error defense.

Moreover, for the bona fide error defense to apply here, ACA must show that its legal research concerning the legality of its voicemail message was ***objectively*** reasonable.  *See*, *Johnson I*, 305 F.3d at 1124-25 (procedural component of bona fide error defense applies to

alleged mistakes of law); *Johnson II*, 443 F.3d at 729 (procedure component of FDCPA's bona

fide error defense is an objective test that "involves a two-step inquiry: first, whether the debt

collector maintained – i.e., actually employed or implemented – procedures to avoid errors; and,

second, whether the procedures were ***reasonably*** adapted to avoid the specific error at issue")

(emphasis added).  Where the alleged bona fide error "involves a mistake of law, whether the

debt collector's mistake was bona fide will turn on the debt collector's due diligence practices."

*Johnson II*, 443 F.3d at 729.  For ACA to prevail on its bona fide error defense, it must show that

it fairly interpreted the language of the FDCPA itself and that it employed a process that allowed

it to adequately consider all relevant case law.  *See*, *Nielsen v. Dickerson*, 307 F.3d 623 (7th Cir.

(bona fide error defense not available to debt collector that acted contrary to a single published

federal court opinion); *Hulshizer v. Global Credit Services, Inc.*, 728 F.2d 1037, 1038 (8th Cir.

1984) (bona fide error defense rejected where "the language of the statute [was] unambiguous

and [the debt collector's] disregard of that language [was] undisputed").  *Compare*, *Watkins v.*

*Peterson Enterprises, Inc.*, 57 F.Supp.2d 1102, 1107 (E.D. Wash. 1999) (debt collector prevailed

under bona fide error defense because it showed its legal practices "were accepted by courts

throughout the state").  *See also*, Janet Flaccus, *Fair Debt Collection Practices Act: Lawyers and*

*the Bona Fide Error Defense*, 2001 ARK. L. NOTES 95 (2001) (arguing that the bona fide error

defense for mistakes of law should only be available where the law is unsettled, but not where it

is reasonably clear).  A debt collector that ignores the relevant case law because the case law

does not agree with its practice is not entitled to claim bona fide error.  *Seeger v. AFNI, Inc.*, 548

F.3d 1107, 1113 (7th Cir. 2008) (debt collector's showing that "it attempted to keep itself

informed about the law" but where it failed to conduct research on the most relevant law "is not

enough . . . to support the bona fide error defense").

ACA's bona fide error defense significantly expands the relevant areas for discovery in this lawsuit.  *See*, *Johnson II*, 443 F.3d at 728 (concerning intent component of mistake of law bona fide error defense, debt collector must first show that it did not intentionally violate the FDCPA but plaintiff can rebut this claim "by inferential evidence"); *Edwards v. McCormick*, 136 F.Supp.2d 795, 802 (S.D. Ohio 2001) (concerning procedural component of bona fide error defense, principal may assign his agent "error-catching" procedures, but where the principal has an essential role concerning the activity at issue "an abdication of that responsibility necessarily destroys the effectiveness of the procedure itself").  Accordingly, a significant portion of Ms. Anchondo's discovery focuses on ACA's bona fide error defense.

### E.     ACA Is Stalling Concerning Much of Ms. Anchondo's Discovery

ACA still has not produced a single document in response to Ms. Achondo's first for discovery.

On December 4, 2008, Ms. Anchondo served her first set of discovery on ACA.  *See*, Exhibit B, discovery requests.  *See also*, Docket No. 41, certificate of service.  On January 6, 2009, ACA responded.  *See*, Exhibit A, discovery responses.  ACA's responses were incomplete and evasive.  *See*, *id.*  ACA did not produce a single document in connection with its initial responses.

Ms. Anchondo expended significant efforts to obtain voluntary supplementation from ACA.  In a 16 page letter dated January 13, 2009, Ms. Anchondo set forth the authority that supported her entitlement to complete responses to the disputed discovery requests.  *See*, B, letter.  In this letter, Ms. Anchondo informed ACA that, due to local rule, she would need to file

7

her motion to compel on January 26, 2009, unless the discovery disputes could be resolved before that date.  *See*, *id.  See also*, D. N.M. LR-Civ. 26.6 (motions to compel must be brought within 20 days of service of the objections).  Ms. Anchondo attached to this letter a proposed protective order in order to satisfy ACA's concern that some of the requested information and documents were of a proprietary nature.  *See*, *id.*

ACA did not respond to the January 13 letter until January 21, 2008, except to provide its own protective order the day before.  *See*, Exhibit C, email and letter.  Ms. Anchondo immediately approved the proposed protective order and responded to ACA's letter the very next day, again reminding ACA that she would file a motion to compel on January 26 unless she received the withheld documents and the promised supplemental responses before that date.  *See*, Exhibit D, letter.  In response, ACA again promised to provide some documents and partial supplementation.  *See*, Exhibit E, email string.  Accordingly, Ms. Anchondo filed this motion to compel.  On the morning of January 26, ACA provided partial supplementation.  *See*, Exhibit F, supplemental discovery responses.  However, many discovery disputes remain.

ACA faults Ms. Anchondo for following the rules and filing her motion to compel on the last day allowed under the rules for the motion.  *See*, Exhibit E, email string.  ACA has not followed the rules.  Despite having had seven weeks to do so, ACA still has not produced a single document.  ACA is stalling.

## II.    ACA's Supplementation Failed to Resolve Disputes Concerning Two Interrogatories that Pertain to ACA's Bona Fide Error Defense and Failed to Resolve Disputes Concerning the Requests for Production (Interrogatories Nos. 16 and 21 and Requests for Production Nos. 1, 2, 4, 5, 7, 8, 11, 12 and 13)

In ACA's January 21 letter, it agreed to supplement its responses to numerous requests.

8

*See*, Exhibit C, letter.  On the morning of January 26, ACA faxed Ms. Anchondo supplemental responses to the requests for admission and to the interrogatories.  *See*, Exhibit F, supplemental discovery responses.  ACA did not provide any supplementation to the requests for production. In fact, ACA still has yet to produce a single document.  Accordingly, Ms. Anchondo seeks an order to compel that includes Requests for Production Nos. 1, 2, 4, 5, 7, 8, 11, 12 and 13. Although ACA has stated that it will produce documents responsive to these requests, it has not done so.  *See*, Exhibit A, discovery responses; Exhibit C, letter.

Also, ACA's supplementation concerning two of the interrogatories – Interrogatories Nos. 16 and 21, both which deal with ACA's bona fide error defense – is insufficient.[2]

In Interrogatory No. 21, Ms. Anchondo asks ACA to list the facts, witnesses and documents that support its affirmative defenses.  ACA has raised 7 affirmative defenses, including bona fide error, an attack on Ms. Anchondo's suitability as a class representative, a claim of setoff based on the predicate APX Alarm account, a claim that ACA's agents acted "outside of the line and scope of their employment" and an allegation that Ms. Anchondo

---

[2] In Interrogatory No. 16, Ms. Anchondo asks ACA to describe its policies for avoiding the FDCPA violations that she alleges in this lawsuit.  Specifically, Ms. Anchondo requests that ACA describe its policies and procedures for identifying itself as the caller in telephone messages it leaves or causes to be left with debtors and its policies and procedures for stating that the message is from a debt collector.  *See*, 15 U.S.C. §§ 1692d(6) and 1692e(11).  In ACA's initial response, it did not provide any information concerning procedures specific to these two violations.  Accordingly, Ms. Anchondo asked ACA to supplement its response.  *See*, Exhibit B, letter.  ACA agreed to do so.  *See*, Exhibit C, letter.

In ACA's supplemental response to Interrogatory No. 16, it did not provide any additional information. The answer to Interrogatory No. 16 that ACA gave in its supplemental response is the same answer that it gave in its initial response.  *Compare*, Exhibit A, discovery responses (response to Interrogatory No. 16) *with* Exhibit F, supplemental discovery responses (response to Interrogatory No. 16).  Apparently, ACA is waiting for the entry of the protective order before it will supplement its response to Interrogatory No. 16.  *See*, Exhibit C, letter.  ACA attempted to move the Court for entry of the protective order, but the Court rejected ACA's efforts because ACA had the incorrect case caption listed on the pleadings and on the order.  *See*, Docket No. 45, motion; Docket No. 46, notice of deficiency.  Ms. Anchondo assumes that ACA will submit proper pleadings in the near future and supplement its response to Interrogatory No. 16 once the Court enters the protective order.  Accordingly, Ms. Anchondo reserves her right to ask the Court to compel ACA to provide additional information responsive to Interrogatory No. 16, if the supplemental response turns out to be insufficient.

brought this lawsuit "in bad faith for the purpose of harassment."  Docket No. 3, answer, ¶¶ 33-40.  ACA's initial answer is wholly insufficient in light of these defenses.  In full, ACA's initial response reads:

> Defendant believes that it is in full compliance with all applicable laws and as stated in its answer, Defendant is not liable for any actions of its agents or employees committed outside of the line and scope of their employment. Defendant has not yet determined who will be called as witnesses, but will timely supplement this information.

Exhibit A, discovery responses (response to Interrogatory No. 21).

In the January 13 letter, Ms. Anchondo pointed out that with ACA's initial response, it failed to provide any substantive information concerning any of its defenses, but simply parroted the defenses as already stated in its answer.  *See*, Exhibit B, letter.  In the January 21 letter, ACA agreed to supplement its initial response to Interrogatory No. 21.  *See*, Exhibit C, letter.

However, ACA's supplemental response is not much better than its original response.  In its supplemental response, ACA restates that same text that it had stated in its initial response and adds:

> Defendant [sic] has not plead [sic] for actual damages and does not believe that Plaintiff sustained any actual damages.  Defendant's bona fide error defense is applicable in this case since it has policies and procedures in place designed to prevent the alleged error asserted by Plaintiff.  Defendant does not believe it violated the FDCPA in its voicemail messages since Plaintiff had actual knowledge of the purpose of the telephone call and the mini-Miranda had been given in a prior correspondence to Plaintiff.  Defendant does not believe Plaintiff to be an adequate class representative since she sustained no damages.  Defendant did not violate the FDCPA in its communications with Plaintiff, and Plaintiff lacks standing to prosecute the class action since a Rule 68 Offer of Judgment was made for the maximum amount of damages and attorney's fees Plaintiff could recover under the FDCPA was made by Defendant [sic] and not accepted by Plaintiff.

*See*, Exhibit F, supplemental discovery responses (response to Interrogatory No. 21).

10

Ms. Anchondo is left to guess concerning numerous factual matters.  Most importantly, Ms. Anchondo is left to guess about the factual predicate for ACA's bona fide error defense. ACA does not provide Ms. Anchondo with factual information concerning its bona fide error defense by restating in the abstract one of the elements that ACA must show to prevail on its bona fide error defense.  *See*, *Johnson I*, 305 F.3d at 1121 (for a debt collector defendant to prevail under the bona fide error defense, the debt collector must show "that the violation was (1) unintentional, (2) a bona fide error, and (3) made despite the maintenance of procedures reasonably adapted to avoid the violation") (quotations omitted).  Ms. Anchondo understands that by bringing a bona fide error defense, ACA is necessarily claiming that it "has policies and procedures in place designed to prevent the alleged error asserted by Plaintiff."  This statement begs the question.  What are the specific policies and procedures that ACA had in place to prevent violations of 15 U.S.C. §§ 1692d(6) and 1692e(11)?  Since ACA's bona fide error defense must necessarily be one that also encompasses a claimed mistake of law – the voicemail message, on its face, violates the FDCPA according to numerous federal court opinions – what legal research or authority is it relying on to claim that its voicemail message complied with the FDCPA?

Moreover, ACA has not even attempted to address the other two elements to a bona fide error defense.  For a debt collector to prevail on a bona fide error defense, there must be proof of a specific error.  *Id.*  What is the error claimed by ACA?  For a debt collector to prevail on a bona fide error defense, there must be proof of subjective intent, *i.e.*, that the person that made the error did not intend to make the error.  *Id.*  Who made the error?  Why did this person think he or

she was complying with the law?

ACA still has not answered these threshold questions concerning its bona fide error defense.  ACA is hiding the ball.

Also, ACA's response fails to address some of its other affirmative defenses.  How does ACA claim setoff based on the APX Alarm account, when it has admitted that it does not own the account?[3]  *See*, Exhibit A, discovery responses (responses to Requests for Admission Nos. 9 and 10).  What facts does ACA rely on to claim that ACA's agents acted "outside of the line and scope of their employment" and who are these agents?[4]  What is the factual basis for ACA's allegation that Ms. Anchondo brought this lawsuit "in bad faith for the purpose of harassment"?

## III.   ACA Refuses to Provide the Information or Produce the Documents Necessary for a Class List (Interrogatory No. 6 and Subpart (c) of Request for Production No. 3)

Ms. Anchondo and ACA reached a compromise concerning the requests that pertain to numerosity – Requests for Admission Nos. 1, 2, 3 and 4 and Interrogatory No. 5 – by agreeing to limit the requests to the number of persons who meet the class parameters including that the voicemail message was left in an attempt to collect a debt originally owed to APX Alarm.  *See*, Exhibit D, letter.  *See also*,  FRCP 23(a)(1) (to maintain a class action, a plaintiff must prove up numerosity).  This fact – that the voicemail message was left in an attempt to collect a debt originally owed to APX Alarm – is an element of the class definition that Ms. Anchondo

---

[3] Ms. Anchondo notes that ACA has stated that it will withdraw its defense of setoff, but it has not yet done so.  *See*, Exhibit C, letter.  Ms. Anchondo concedes that if ACA withdraws this defense, it would not need to supplement Interrogatory No. 21 with regard to this defense.

[4] Ms. Anchondo notes that ACA has stated that it will withdraw its defense concerning whether its employees and agents acted outside of the bounds and scope of their employment, but it has not yet done so.  *See*, Exhibit C, letter.  Ms. Anchondo concedes that if ACA withdraws this defense, it would not need to supplement Interrogatory No. 21 with regard to this defense.

inadvertently omitted from the requests.  *See*, Docket No. 1, complaint, ¶ 16.

Ms. Anchondo offered to agree to this same limitation for Interrogatory No. 6 and subpart (c) of Request for Production No. 3, in which Ms. Anchondo asks ACA to provide the names, addresses and telephone numbers of the putative class members, or, in other words, asks ACA to provide a class list, or provide the documents that would allow Ms. Anchondo to assemble the class list.  *See*, Exhibit D, letter.  However, in the January 21 letter, ACA makes clear that even with this limitation, ACA would still refuse to provide the requested information and documents, based on its argument that any response would require it to violate the FDCPA.  *See*, Exhibit C, letter.

ACA's argument is without merit.  Responding to Interrogatory No. 6 and subpart (c) of Request for Production No. 3 would not require ACA to violate the FDCPA.  The FDCPA's prohibition on disclosure to third parties does not apply to discovery in FDCPA class actions. *See*, *Kelly v. Montgomery Lynch & Associates, Inc.*, No. 1:07-CV-919, 2007 U.S. Dist. LEXIS 93651 at *9-10 (N.D. Ohio Dec. 13, 2007).  *See also*, *Federal Trade Commission v. Shaffner*, 626 F.2d 32, 36 (7th Cir. 1980) ("We find appellee's argument that to disclose the information in his files related to consumer debtors and their complaints would violate their privacy rights under the Fair Debt Collection Practices Act without merit"); *XYZ Law Firm v. Federal Trade Commission*, 525 F.Supp. 1235, 1238 (N.D. Ga. 1981) ("there is nothing in the [FDCPA] which prohibits the FTC from requesting from a law firm enough information to determine whether, for example, non-attorneys are involved in the debt collection process").

## IV.   ACA Refuses to Produce the Documents that Would Show the Identities of Key Witnesses (Subpart (b) of Request for Production No. 3)

ACA initially refused to provide the identities of any of the persons involved in the

process by which it leaves the automated voicemail messages for consumer debtors, but it then reversed itself concerning these requests (Interrogatories Nos. 4, 11, 12, 15 and Request for Production No. 11). *See*, Exhibit C, letter. Despite the fact that subpart (b) of Request for Production No. 3 also seeks documents that will show the identities of key witnesses, ACA still refuses to produce any documents in response to this request. This position is puzzling given ACA's reversal concerning the other requests that concern the identities of potential witnesses.

Apparently, ACA refuses to supplement its response to subpart (b) of Request for Production No. 3 based on the argument that to do so would constitute a violation of the FDCPA. As shown above, this argument is without merit. *See*, *infra*, § III.

## V. ACA Refuses to Provide Information that Would Allow Ms. Anchondo to Contact the Creditors for Whose Accounts ACA Left the Voicemail Message (Interrogatory No. 9)

In Interrogatory No. 9, Ms. Anchondo seeks contact information for the creditors from whom ACA obtained the right to collect, where The Voicemail Message was utilized. ACA refuses to provide the requested information because Interrogatory No. 9 is not limited to APX Alarm only.[5] *See*, Exhibit C, letter.

ACA ignores that Interrogatory No. 9, by allowing Ms. Anchondo access to the relevant creditors, would help Ms. Anchondo show commonality and typicality under Rule 23 and help her rebut ACA's affirmative defense of bona fide error. *See*, FRCP 23(a)(2) and (3) (to maintain a class action, a plaintiff must prove up commonality and typicality). The discovery that would

---

[5] It is noteworthy that ACA ultimately provided a substantive answer to a related interrogatory – Interrogatory No. 10, where Ms. Anchondo asked for contact information for the telephone service companies that ACA hired to leave the voicemail message – although it initially refused to do so. *Compare*, Exhibit A, discovery responses (response to Interrogatory No. 10) *with* Exhibit F, supplemental discovery responses (response to Interrogatory No. 10).

likely flow from a substantive response to Interrogatory No. 9 would likely show that ACA

employs a well defined mechanical process for the leaving of the voicemail message, controlled

entirely by ACA, without regard to the creditor whose accounts are at issue, and without

individual variation or decision making input from any of the creditors.  This information would

also help Ms. Anchondo rebut ACA's defense that its agents acted "outside of the line and scope

of their employment."[6]  *See*, Docket No. 3, answer, ¶ 38.

## VI.   ACA Refuses to Produce Documents that Would Show Who Created, Edited, Approved or Authorized the Voicemail Message and that Would Show the Process ACA Employed for these Activities (Subpart (b) of Request for Production No. 3)

ACA initially refused to provide information that pertains to its purported belief that its

voicemail message complies with the FDCPA, but it then reversed itself concerning these

requests (Interrogatory No. 16 and Requests for Production Nos. 12 and 13).  *See*, Exhibit C,

letter.  Despite the fact that subpart (a) of Request for Production No. 3 also seeks documents

that would pertain to ACA's purported belief that the voicemail message complies with the

FDCPA, and despite the fact that ACA responded to a related interrogatory and stated that

"Thomas Backal, CEO, created and approved the voicemail message," ACA still refuses to

produce any documents in response to subpart (a) of Request for Production No. 3.[7]  *See*, Exhibit

A, discovery responses (response to Interrogatory No. 3); Exhibit C, letter.  This position is

---

[6] Ms. Anchondo notes that ACA has stated that it will withdraw its defense concerning whether its employees and agents acted outside of the bounds and scope of their employment, but it has not yet done so.  *See*, Exhibit C, letter.  However, even if ACA does actually withdraw this defense, Ms. Anchondo would still be entitled to a supplemental response to Interrogatory No. 9 because a response to this request would likely lead to admissible evidence concerning commonality and typicality.  Moreover, a response to this request would likely help Ms. Anchondo rebut ACA's bona fide error defense.

[7] In subpart (a) of Request for Production No. 3, Ms. Anchondo asks ACA to produce "all documents concerning the creation, editing, approving or authorizing of The Voicemail Message."

puzzling given ACA's reversal concerning the other requests that concern its compliance policies.

## VII.   ACA Refuses to Produce Documents that Would Show the Parameters of Its Relationship with APX Alarm (Requests for Production Nos. 9 and 10)

In Request for Production No. 9, Ms. Anchondo asks ACA to produce the agreement between it and APX Alarm.  In Request for Production No. 10, Ms. Anchondo asks ACA to produce documents that show the nature of its interest in the APX Alarm account that it tried to collect from Ms. Anchondo.  Ms. Anchondo has agreed to the proposed protective order, so ACA's argument that these requests would require production of documents that contain proprietary information is now moot.  Yet, ACA still refuses to produce any documents responsive to either request.  *See*, Exhibit C, letter.

In order to avoid having to produce documents responsive to Request for Production No. 9, ACA states it will withdraw its defense concerning whether its employees and agents acted outside of the bounds and scope of their employment.  *See*, *id.*  In order to avoid having to produce documents responsive to Request for Production No. 10, ACA states that it will withdraw its claim for setoff.  *See*, *id.*  Ms. Anchondo notes that ACA has not withdrawn any of its defenses as of the time that she filed this motion.

Moreover, ACA's withdraw of some of its defenses would not render Requests for Production Nos. 9 and 10 not relevant.  Ms. Anchondo is entitled to discovery that will help her understand the relationship between ACA and APX Alarm.  ACA does business under the name of "Alarm Debt Liquidation Group," which it lists as a trade name for ACA.  *See*, Exhibit G, Texas Secretary of State documents.  Also, Mr. Backal, ACA's CEO, is the president, director, secretary and treasurer of a company named "Alarm Payment Processing PC," which shares the

16

same address with ACA and also does business as "Alarm Services and Products."  *See*, *id.*

Given these facts, ACA may do collection work for APX Alarm under the name of APX Alarm as well as under its own name.  Ms. Anchondo received numerous abusive collection calls from persons who identified themselves as employees of APX Alarm and at least one harassing call from a person that was attempting to collect on the APX Alarm account but who did not identify his employer.  *See*, *Anchondo v. APX Alarm Security Solutions, Inc.,* No. D-1329-CV-08-560 (Sandoval County District Court). Given the cloudiness of the relationship between ACA and APX Alarm and the fact that both companies collect on the same debt accounts, it is all the more important for ACA to identify itself when communicating with consumer debtors.  Also, it is all the more important that Ms. Anchondo be allowed to review the documents that would define the relationship between ACA and APX Alarm.

Even more importantly, the agreement with APX Alarm would likely set forth the parameters under which ACA is allowed to collect on APX Alarm's debt accounts, including the scope of APX Alarm's participation in the creation or approval of the voicemail message employed by ACA.  This information will help Ms. Anchondo rebut ACA's bona fide error defense.  This information would also help Ms. Anchondo rebut ACA's defense that its agents acted "outside of the line and scope of their employment."[8]  *See*, Docket No. 3, answer, ¶ 38.

---

[8] Ms. Anchondo notes that ACA has stated that it will withdraw its defense concerning whether its employees and agents acted outside of the bounds and scope of their employment, but it has not yet done so.  *See*, Exhibit C, letter.  However, even if ACA does actually withdraw this defense, Ms. Anchondo would still be entitled to the documents responsive to Requests for Production Nos. 9 and 10 because these documents would likely help Ms. Anchondo rebut ACA's bona fide error defense.

**VIII.   ACA Refuses to Produce Its Agreement with the Telephone Service Company that Left the Voicemail Message on Its Behalf (Request for Production No. 6)**

In Request for Production No. 6, Ms. Anchondo asks ACA to produce agreements between it and any telephone service company that left the voicemail message during the relevant time period, where the agreement was in effect during this time.  Apparently, per ACA's supplemental response to Interrogatory No. 10, only a single agreement is at issue because, per this response, the only telephone service company employed by ACA during the relevant time period was Global Connect, Inc.  *See*, Exhibit F, supplemental responses (response to Interrogatory No. 10).  Ms. Anchondo has agreed to the proposed protective order, so ACA's argument that its agreement with Global Connect contain proprietary information is now moot.  Yet, ACA still refuses to produce the agreement.  *See*, Exhibit C, letter.

In order to avoid having to produce the agreement, ACA states it will withdraw its defense concerning whether its employees and agents acted outside of the bounds and scope of their employment.  *See*, *id.*  Ms. Anchondo notes that ACA has not withdrawn any of its defenses as of the time that she filed this motion.

Moreover, ACA's withdraw of this defense would not render Request for Production No. 6 not relevant.  Ms. Anchondo is entitled to discovery that will help her understand the relationship between ACA and Global Connect.  The agreement between ACA and Global Connect would likely set forth the parameters under which Global Connect leaves ACA's voicemail message for consumer debtors, including the scope of Global Connect's discretion concerning the message and whether ACA must first approve the message.  This information will help Ms. Anchondo rebut ACA's bona fide error defense.

18

IX.   **ACA Refuses to Produce Information or Documents Concerning Its Research Pertaining to Its Purported Belief that the Voicemail Message Complies with the FDCPA (Interrogatory No. 18 and Request for Production No. 14)**

In Interrogatory No. 18, Ms. Anchondo asks ACA to describe any legal research that it performed, or had others perform, concerning whether its voicemail message complies with the FDCPA and to identify any attorneys that undertook this research.  In Request for Production No. 14, Ms. Anchondo asks ACA to produce the documents that show this legal research.  These requests clearly go right to the heart of ACA's bona fide error defense, yet ACA has resolved to stand on its privilege assertion.  *See*, Exhibit C, letter.  ACA has offered no authority to back its position, while Ms. Anchondo has provided a tidal wave of authority that supports the proposition that "[a] litigant may not use the attorney client privilege as both a sword and a shield, disclosing only those communications which are beneficial to the litigant's defense." *Kansas Food Packers v. Corpak*, No. 99-1418, 2000 U.S. Dist. LEXIS 19813 at *7 (D. Kan. Oct. 12, 2000).

It is well established that privilege is not absolute.  "The party seeking to assert a privilege has the burden of establishing its applicability."  *Motley v. Marathon Oil Company*, 71 F.3d 1547, 1550 (10th Cir. 1995).

Privilege may "yield in a proper case, where strong public policy requires disclosure."  *Id.* at *6, *quoting*, *Leucadia, Inc. v. Reliance Insurance Company*, 101 F.R.D. 674, 679 (S.D. N.Y. 1983).  "[T]he policy of the privilege is to protect confidential attorney-client relationships only to the extent that the injury the relationship would suffer from disclosure is greater than the benefit to be gained thereby."  *Hearn v. Rhay*, 68 F.R.D. 574, 582 (E.D. Wash. 1975).

Here, ACA cannot claim privilege because it has placed its legal research concerning the

19

legality of its voicemail message at issue.  A party waives attorney client privilege "when the material to be discovered is both relevant to the issues raised in the case and either vital or necessary to the opposing party's defense of the case."  *Frontier Refining Inc. v. Gorman-Rupp Company, Inc.*, 136 F.3d 695, 699 (10th Cir. 1998).  The Tenth Circuit's standard for this at issue exception is more liberal than the standard used by some other circuits.  Other circuits find waiver of the privilege "if, and only if, the litigant directly puts the attorney's advice at issue in the litigation."  *Id.*, *citing*, *Rhone-Poulenc Rorer Inc. v. Home Indemnity Company*, 32 F.3d 851, 863-64 (3d Cir. 1994).  However, the Tenth Circuit allows waiver of privilege under the at issue exception where a party proves up only three elements:

> (1) assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to its defense.

*Frontier Refining Inc.*, 136 F.3d at 701, *quoting*, *Hearn*, 68 F.R.D. at 581.  "If a party asserts as an essential element of his defense reliance upon the advice of counsel, the party waives the privilege with respect to all communications, whether written or oral, to or from counsel concerning the transactions for which the advice was sought."  *Kansas Food Packers*, 2000 U.S. Dist. LEXIS 19813 at *8.  The at issue exception applies to the attorney client privilege and to the attorney work product privilege.

> [A] litigant cannot use the work product doctrine as both a sword and a shield by selectively using the privileged documents to prove a point but then invoking the privilege to prevent an opponent from challenging an assertion.

*Frontier Refining Inc.*, 136 F.3d at 704.

The flagship case concerning the at issue exception is *Hearn v. Rhay*, *supra*.  In *Hearn*,

20

the federal district court for the Eastern District of Washington considered whether privilege is

waived where the defendant – a  prison facility – consulted with the state attorney general.  The

consultations concerned the legality of confinement in the prison's mental health unit.  The

plaintiff challenged the constitutionality of this confinement.  The prison raised the affirmative

defense of qualified immunity.  This defense required the prison to show that it acted in good

faith.  68 F.R.D. at 577. The *Hearn* court found that the prison waived any privilege that it may

have had by asserting the good faith defense.

> [D]efendants invoked the privilege in furtherance of an affirmative defense they
> asserted for their own benefit; through this affirmative act they placed the
> protected information at issue, for the legal advice they received is germane to the
> qualified immunity defense they raised; and one result of asserting the privilege
> has been to deprive plaintiff of information necessary to "defend" against
> defendants' affirmative defense, for the protected information is also germane to
> plaintiff's burden of proving malice or unreasonable disregard of his clearly
> established constitutional rights.

*Id.* at 581.  The defendant's good faith defense caused the prison's consultations with its lawyers

to be part of "the controversy itself."  The court held that "to deny access to [the legal

consultations] would preclude the court from a fair and just determination of the issues."  *Id.* at

582.

> To allow assertion of the privilege in this manner would pervert its essential
> purpose and transform it into a potential tool for concealment of unconstitutional
> conduct behind a veil of confidentiality.  Under these circumstances, the benefit to
> be gained from disclosure far outweighs the resulting injury to the attorney-client
> relationship.  The privilege should not apply.

*Id.*

Here, ACA's bona fide error defense, akin to the good faith defense in *Hearn*, places its

legal research concerning the voicemail message squarely at issue.  ACA cannot hide behind

privilege objections.  Discovery of ACA's legal research is critical for Ms. Anchondo to be able

to rebut ACA's bona fide error defense.  The only method that Ms. Anchondo has for obtaining

the research is through discovery directed to ACA.  Any privilege that ACA would otherwise be

able to claim must yield.

**X.    ACA Refuses to Provide Net Worth Documents (Requests for Production Nos. 18, 19, 20, 21, 22 and 23)**

Because this lawsuit is a FDCPA class action, ACA's net worth is discoverable.  Per the

FDCPA, class statutory damages recovery is limited to "the lesser of $500,000 or 1 per centum of

the net worth of the debt collector."  15 U.S.C. § 1692k(a)(2)(B)(ii).  Ms. Anchondo does not

seek recovery of actual damages for herself or for the class.  She limits her and putative class

members' FDCPA recovery to statutory damages.[9]  *See*, Docket No. 1, complaint, ¶ 26.  Because

ACA's net worth necessarily determines class damages, a broad exploration of ACA's net worth

is merited.

A majority of state and federal courts permit pretrial discovery of a defendant's net worth

where net worth is at issue.  *See*, *Mid Continent Cabinetry, Inc. v. George Koch Sons, Inc.*, 130

F.R.D. 149, 151 (D. Kan. 1990) (collecting cases).  The New Mexico federal district court is part

of this majority.  *See*, *Pedroza v. Lomas Auto Mall, Inc.*, No. 07-591, 2008 U.S. Dist. LEXIS

91733 at *6-7 (D. N.M. Nov. 10, 2008) (pretrial discovery of net worth allowed unless the claim

that puts net worth at issue is "spurious").  Ms. Anchondo is entitled to obtain net worth

information at this time because "to deny discovery of net worth until plaintiff can make a

showing of a prima facie case at trial would only lead to delay and confusion, while plaintiff

reviews the information for the first time."  *Mid Continent Cabinetry, Inc.* at 152.  These reasons

---

[9] Concerning Ms. Anchondo's sole claim besides her FDCPA claim, she limits her recovery under the New Mexico Unfair Practices Act, NMSA 1978 §§ 57-12-1 *et seq.* ("UPA") to statutory damages for herself and to injunctive relief for herself and the class.  *See*, Docket No. 1, complaint, ¶¶ 30 and 31.

for allowing pretrial discovery of net worth are all the more important in this lawsuit because in this lawsuit class damages are tethered to ACA's net worth.  Moreover, because ACA claims that it has "zero net worth," Ms. Anchondo, as putative class representative, should be allowed to review documents that would verify or disprove this contention, both to satisfy the Court and to discharge her due diligence duties to the class.  *See*, Exhibit F, supplemental responses (response to Interrogatory No. 23).  *See also*, FRCP 23(e)(2) (in deciding whether to approve a class settlement, court should consider whether the settlement is "fair, reasonable and adequate"); *Schick v. Berg*, No. 03-CV-5513, 2004 U.S. Dist. LEXIS 6842 at *16 (S.D. N.Y. Apr. 20, 2004) (in class action, court's oversight is "necessary to protect putative class members" and this protection can be accomplished, partly, through "class representatives [who act] as fiduciaries to advocate [for] the class interests").

Ms. Anchondo is entitled to net worth discovery at this time because her FDCPA claim against ACA is not spurious.  The Court has already rejected ACA's effort to dismiss the lawsuit. Docket No. 35, order, *reported at*, 583 F.Supp.2d 1278.  Ms. Anchondo's claims concern ACA's failure to identify itself or state that the caller is a debt collector in the voicemail messages it left for consumer debtors.  Numerous courts have held that nearly identical voicemail messages left by debt collectors violate the FDCPA as a matter of law.  *See*, *infra*, § I(A).

Another consideration further supports allowing Ms. Anchondo to engage in discovery concerning ACA's net worth at the present time.  The Court has set a settlement conference in this lawsuit for April 2, 2009, with the parties to exchange settlement demands and offers prior to the conference.  *See*, Docket No. 40, order.  Without reliable net worth information and documents, it will be impossible for Ms. Anchondo to realistically and effectively engage in class

23

settlement negotiations.

Ms. Anchondo is sensitive to the proprietary nature of ACA's net worth.  She has agreed to ACA's proposed protective order.  However, ACA still refuses to provide any net worth information or produce any net worth documents.  *See*, Exhibit C, letter.

In Request for Production No. 18, Ms. Anchondo asks ACA to produce documents that it utilized, referred to or consulted concerning the net worth figure that it provided in response to Interrogatory No. 23, wherein it stated that it has "zero net worth."  *See*, Exhibit F, supplemental responses (response to Interrogatory No. 23).  In Request for Production No. 19, Ms. Anchondo asks ACA to produce documents that show its net worth in the last three years.  If ACA has shown net worth in the past, this fact would suggest that further exploration is needed into ACA's claim that it currently has "zero net worth."  *Id.*  In Request for Production No. 20, Ms. Anchondo asks for documents that would show ACA's corporate structure in the last five years. These documents would help Ms. Anchondo determine if part of ACA's net worth resides with or has been transferred to other business entities.  In Request for Production No. 21, Ms. Anchondo asks ACA to produce documents that show compensation to its board members and officers in the last five years.  These documents would help Ms. Anchondo determine whether ACA hides net worth through extravagant compensation.  In Request for Production No. 22, Ms. Anchondo asks ACA to produce documents that show valuation of ACA's capital stock and/or goodwill in the last five years.  *See*, *Wisneski v. Nationwide Collections, Inc.*, 227 F.R.D. 259, 261 (E.D. Pa. 2004) (for FDCPA class action purposes, a defendant's net worth includes equity, capital stock and goodwill).  In Request for Production No. 23, Ms. Anchondo asks ACA to produce documents that govern the relationship between it and all other entities that operate

24

under any trade name organized under ACA.  These documents will help Ms. Anchondo determine whether ACA hides net worth by transfers to alter ego companies.

Ms. Anchondo has good reason to believe that net worth discovery will not be a straight forward process with ACA.  According to documents filed with the Texas Secretary of State, ACA operates under at least five trade names including Alarm Debt Liquidation Group, Commercial Debt Liquidation Group, Debt Liquidation Group, Extermination Debt Liquidation Group and Property Debt Liquidation Group.  *See*, Exhibit G, Texas Secretary of State documents.  ACA's CEO, Mr. Backal, is a director in numerous other business entities, including Alarm Payment Processing PC, DuBaHa, Inc. and Dubaha Security LLC, all which have the same address as ACA.  *See*, *id.*  Steven R. Dunn, the attorney representing ACA in this lawsuit, and whose office is located at ACA's address, is also a director for DuBaHa, Inc. and Dubaha Security LLC.  *See*, *id.*  Courts should act carefully to ensure that accurate net worth information is obtained where net worth is at issue.  *See*, *e.g.*, *Lockley v. Deere & Company a/k/a John Deere Company*, 933 F.2d 1378, 1388 (8th Cir. 1991).  Ms. Anchondo is entitled to review the documents necessary to ensure that ACA is presenting a true picture of its net worth.[10]

---

[10] Ms. Anchondo has reason to believe that ACA is not always truthful.  In Interrogatory No. 20, Ms. Anchondo asked ACA for information concerning similar lawsuits:

> Identify all other lawsuits and claims to government agencies, (*e.g.*, the Federal Trade Commission or state attorneys general offices), brought against ACA in the last five years, in which the complainant alleged unlawful conduct or violations of the FDCPA concerning telephone messages left for the alleged debtor.  For each claim, state the name of all persons who brought the claim.  For each civil action, state the full caption, identify the court, the docket number and the names and addresses of opposing attorneys.

*See*, Exhibit A, discovery responses (response to Interrogatory No. 20).  Mr. Bakal, ACA's CEO, answers by stating "Defendant does not believe any other lawsuit has been brought involving alleged violations of the FDCPA concerning telephone messages."  *See*, *id.*  *See also*, *id.* (response to Interrogatory No. 1, in which ACA states that Mr. Backal, its CEO, was the only person that answered the interrogatories).  However, ACA has been sued in another class action – *Huntley v. Anderson, Crenshaw & Associates, L.L.C.*, No. 07-CV-5116 (E.D. N.Y. Dec. 7, 2007) – for failing to identify itself or state that the communication is an attempt to collect a debt in the voicemail messages it leaves for consumer debtors.

## XI.    Conclusion

Ms. Anchondo requests that the Court order ACA to provide full and complete responses to Interrogatories Nos. 6, 9, 16, 18 and 21 and produce all documents responsive to Requests for Production Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 18, 19, 20, 21, 22 and 23, within ten calendar days of the order.

Respectfully submitted,

FEFERMAN & WARREN

*/s/ Rob Treinen*
_____
ROB TREINEN
300 Central Ave. SW, Suite 2000 East
Albuquerque, New Mexico 87102
(505) 243-7773
(505) 243-6663 (fax)
HORWITZ, HORWITZ & ASSOCIATES
O. RANDOLPH BRAGG
25 East Washington Street, Suite 900
Chicago, Illinois 60602
(312) 372-8822
(312) 372-1673 (fax)

ATTORNEYS FOR PLAINTIFF


I CERTIFY that I served the foregoing pleading by mailing a copy to Steven R. Dunn, attorney for Defendant Anderson, Crenshaw & Associates LLC, at North Central Plaza III, Suite 250, 12801 North Central Expressway, Dallas, Texas 75243; and to Douglas G. Schneebeck, attorney for Defendant Anderson, Crenshaw & Associates LLC, at Modrall Sperling Roehl Harris & Sisk PA, 500 4th St. NW, Suite 1000, Albuquerque, New Mexico 87102, on January 26, 2009.

*/s/ Rob Treinen*
_____
ROB TREINEN